KING, JUSTICE,
DISSENTING:
¶ 19. Because I believe that the Mississippi Public Service Commission (MPSC) clearly has the authority to enforce the regulation at issue on the rural water associations, I respectfully dissent. The deposits at issue are not within the statutory definition of “rates.” Furthermore, the Mississippi Rural Water Association’s other arguments that the rule does not apply to its members likewise fail.

1. The rule does not regulate “rates.”

¶20. “In all actions and proceedings arising under the provisions of this article or growing out of the exercise of the authority and powers herein granted to the commission, the burden of proof shall be on the party seeking to vacate an order of said commission.” Miss. Code Ann. § 77-3-77 (Rev. 2009).
¶ 21. In interpreting agency statutes, exceptions in statutes are ordinarily given a strict or narrow construction. Miss. Dep’t of Wildlife, Fisheries and Parks v. Miss. Wildlife Enforcement Officers’ Ass’n, Inc., 740 So.2d 925, 932 (Miss. 1999) (citing 73 Am. Jur. 2d Statutes § 313, at 463-64 (1974)). Moreover, the agency that administers or enforces a statute is entitled to deference to its interpretation of the statutes, “unless that interpretation is repugnant to the plain meaning of the statute ... or the best reading of the statute.” Miss. Gaming Comm’n v. Imperial Palace of Miss., Inc., 751 So.2d 1025, 1029 (Miss. 1999). Statutory exemptions to jurisdiction are to be construed narrowly, and in accordance with general principles of statutory interpretation. Miss. Dep’t of Wildlife, Fisheries and Parks v. Miss. Wildlife Enforcement Officers’ Ass’n, Inc., 740 So.2d 925, 932 (Miss. 1999).
¶ 22. The MPSC is empowered to regulate public utilities. Miss. Code Ann. § 77-3-2 (Rev. 2009). The MPSC has “exclusive original jurisdiction over the intrastate business and property of public utilities.” Miss. Code Ann. § 77-3-5 (Rev. 2009). However, the MPSC shall not “have jurisdiction to regulate the rates for the sales and/or distribution ... [o]f water or sewage disposal service by nonprofit corporations or associations where the governing body of such corporation or association is elected by the consumers thereof or appointed by the county board of supervisors.” Miss. Cpde Ann. § 77-3-5(c) (Rev. 2009) (emphasis added). Thus, as the specific statute covering the exemption states, the MPSC does not have jurisdiction to regulate the rates for the sales and/or distribution of water of the members of the Water Association. The question is therefore whether the domestic violence rule regulates the rates of the members of the Water Association and is thus beyond the MPSC’s jurisdiction. In making this determination, the Court must construe the exception to the MPSC’s jurisdiction narrowly and give deference to the MPSC’s interpretation of the statute, unless that interpretation is repugnant to the plain meaning or the best reading of the statute.[2]
¶ 23. “Rate” is defined as including
every compensation, charge, fare, toll, rental and classification, or the formul *296 or method by which such may be determined, or any of them, demanded, observed, charged or collected by any public utility for any service, product, or commodity described in this section, offered by it to the public, and any rules, regulations, practices or contracts relating to any such compensation, charge, fare, toll, rental or classification!;.]
Miss. Code Ann. § 77-3-3(e) (Rev. 2009). The term “deposit” is not defined.
¶ 24. The Water Association argues that the definition of “rate” is sufficiently broad so as to include 'deposits.. It also claimá that a deposit is part of the rate structure, thus exempting a deposit from MPSC jurisdiction. The Water Association also points to a comment from the Lexis Nexis Accounting for Public Utilities publication that states that “deposits aré available to the utility for use in support of its rate base investment.”[3] The MPSC argues that “rate” clearly does not encompass deposits, pointing to dictionary definitions of the two words.
¶ 25. It is clear from the statute defining rates that a difference exists between regulating rates or the formula to determine rates, and regulating something that may result in impacting rates. In this case, the MPSC is regulating something that impacts rates, i.e., a deposit, and it is not regulating the rates or rate formulas themselves. In terms- of the rate base, the statute defining “rate” indicates that the MPSC may not regulate certain practices related to rates, such as the rate formula. With the domestic violence rule, the MPSC is not doing so. The MPSC has not mandated that utilities remove deposits from their‘rate base formula. The utilities are free to use 'what formula they choose, including or not including deposits. The MPSC has simpler regulated one ofinumerous things that' can trickle down and impact rates, but it has not regulated the rate or the rate formula.
¶26. The dictionary definitions of the two terms support this notion. A “rate” is defined as “[a]n amount paid or charged for a good or service.” Rate, Black’s Law Dictionary (10th ed. 2014).[4] A “deposit” is money or property given “to another who promises to preserve it or to use it and return it in kind.” Deposit, Black’s Law Dictionary (10th ed. 2014).
¶27. In addition to containing the domestic violence rule, the MPSC’s Rule 9 also provides' that utilities may require “a cash deposit to guarantee the payment of any such bills due or which may become due from such customer and safe return of all property belonging to the utility installed at the customer’s premises or elsewhere.” Miss. Admin. Code § 39-1-2:9.[5] *297 The rule specifies the- maximum amount the deposit may be: for residential customers, “an amount equivalent to a single estimated average bill.” Id. Additionally, any deposits held for more than one year must accrue interest payable to the customer or credited to the customer’s account. Id. Thus, the plain meaning of “deposit” designates a sum of money that ultimately belongs to the customer, unless the condition is met that the customer fails to pay his or her bill. This definition of deposit does not fit into the statutory definition of “rate.”
¶ 28. Last, exemptions to jurisdiction are to be construed narrowly. It is noteworthy that the specific statute exempting the wá-ter associations’ rates from MPSC jurisdiction specifically exempts regulation of “the rates for the sales and/or distribution ... [o]f water or sewage disposal service ..,. ” The specific language of the exemption contemplates only exempting regulation of “rates” in the typical sense, as in the rate for the sale of water. A deposit, based on its plain language definition, is not a rate for the sale of water.
¶ 29. The plain meaning of “rate” does not include a “deposit.” While the timing of a deposit may have the trickle-down effect of impacting the rates of some utilities, this does not transform the deposit into a “rate” that is beyond the MPSC’s jurisdiction.

2. Whether the rule regulates internal affairs.

¶ 30. The MPSC “shall not have jurisdiction over the governance, management or other internal affairs of nonprofit corporations or associations where the governing body of such corporation or association is elected by the consumers thereof or appointed by the county board of supervisors.” Miss. Code Ann. § 77-3-5(c) (Rev. 2009). Therefore, if the domestic violence rule regulates the internal affairs of the water associations, the MPSC does not have jurisdiction to apply it to the members of the Water Association.
¶ 31. The domestic violence rule regulates the timing, but not the amount, of deposits for a subset of customers.' The Water Association argues that such regulation amounts to improper regulation of its members’ government, management, or other internal affairs. The Water Association cites Mississippi Code Section 79-11-151, which outlines general corporate powers. The Water Association argues that setting the timing for deposits falls under conducting business in a manner that exempts the timing of deposits from MPSC jurisdiction.
¶ 32. The MPSC argues that “business regulation” in which it may. not engage includes matters such as hiring and-firing employees, setting salaries, or drafting corporate bylaws. But, it argues, this statutory exemption does not “preclude Commission jurisdiction over matters directly affecting the services the utility provides to its customers.” Citing cases from other jurisdictions, the MPSC argues that postponing a deposit does not usurp managerial prerogatives or invade the discretion of the corporation over internal governance matters. See, e.g., Lone Star Gas Co. v. Corp. Comm’n of Okla., 170 Okla. 292, 39 *298 P.2d 547, 553 (1934) (“The powers of the Commission are to regulate, supervise, and control the public service companies in their services and rates, but these powers do not extend to an invasion of the discretion vested in the corporate management. It does not include the power to approve or disapprove contracts about to be entered into, nor to the approval or veto of expenditures proposed.”).
¶ 33. The MPSC is empowered to regulate public utilities because the Legislature determined “that the rates, services and operations of public utilities as defined in this title are affected with the public interest and that the availability of an adequate and reliable service by such public utilities to the people, economy and government of the State of Mississippi is a matter of public policy.” Miss. Code Ann. § 77-3-2(1) (Rev. 2009). Of course, Section 77-3-5 specifically exempts water associations from MPSC jurisdiction over their rates for the sales and/or distribution of water and over governance, management, or other internal affairs. Yet, construing such exemption narrowly, the MPSC still has jurisdiction over the other services and operations of the water associations. The Water Association’s interpretation of the internal affairs exemption would completely exempt its members from any and all MPSC jurisdiction.[6] Simply because management has the capacity to decide something does not automatically render it an “internal affair.” The Legislature clearly did not intend to completely exempt the water associations from all MPSC regulation. When the Legislature intends to completely exempt entities from MPSC jurisdiction, it has done so explicitly. See, e.g., Miss. Code Ann. § 77-3-1 (Rev. 2009) (“[A]ny public utility ... owned or operated by a municipality shall not be subject to the provisions of this article .... ”). Therefore, the regulation of deposits regulates aspects of the utility services provided by the utility, and not its internal affairs.

3. The rule does not violate the APA because it differs from the proposed rule.

¶ 34. The Water Association argues that the domestic violence rule should be struck because it violates the Administrative Procedure Act’s (APA) provision regarding variances between the adopted rule and proposed rule. The APA provides that
(1) An agency shall not adopt a rule that differs from the rule proposed in the notice of proposed rule adoption on which the rule is based unless all of the following apply:
(a) The differences are within the scope of the matter announced in the notice of proposed rule adoption and are in character with the issues raised in that notice;
(b) The differences are a logical outgrowth of the contents of that notice of proposed rule adoption and the comments submitted in response thereto; and
(c) The notice of proposed rule adoption provided fair warning that the outcome of that rule-making proceeding could be the rule in question.
(2) In determining whether the notice of proposed rule adoption provided fair warning that the outcome of that rule-making proceeding could be the rule in *299 question, an agency shall consider all of the following factors:
(a) The extent to which persons who will be affected by the rule should have understood that the rule-making proceeding on which it is based could affect their interests;
(b) The extent to which the subject matter of the rule or issues determined by the rule are different from the subject matter or issues contained in the notice of proposed rule adoption; and
(c) the extent to which the effects of the rule differ from the effects of the proposed rule contained in the notice of proposed rule adoption.
Miss. Code Ann. § 25-43-3.107 (Rev. 2010). The Water Association’s primary complaint regarding the differences between the proposed and adopted rules lies with the penalties imposed for violation of the confidentiality provision.
¶35. This Court must first examine whether the differences between the two rules “are within the scope of the matter announced in the notice of proposed rule adoption and are in character with the issues raised in that notice.” Confidentiality was certainly announced in the notice of proposed rule adoption. Adding “teeth” to the confidentiality provision is within the scope of the matter announced, as it is still within the scope of keeping the information confidential.
¶ 36. Next, the Court examines whether the “differences are a logical outgrowth of the contents of that notice of proposed rule adoption and the comments submitted in response thereto.” Three separate comments, including those of the Attorney General’s office, raised concerns about confidentiality. The comments indicated that the confidentiality provision of the proposed rule was not stringent enough. A logical outgrowth of the proposed rule requiring confidentiality and the comments indicating that the confidentiality provision was not stringent enough is making the confidentiality provision more stringent, for example, by adding penalties.
¶37. Third, the proposed rule must have provided fair warning that the final rule could be the outcome of the rulemak-ing proceeding. In examining this factor, the Court examines first the “extent to which persons who will be affected by the rule should have understood that the rule-making proceeding on which it is based could affect their interests.” The Water Association moved to intervene, provided comments and evidence, and testified at the hearing. Clearly, the Water Association should have and did understand that the proceedings could affect its interests. Next, the Court examines the “extent to which the subject matter of the rule or issues determined by the rule are different from the subject matter or issues contained in the notice of proposed rule adoption.” The subject matter, waiver of deposit for domestic violence victims and confidentiality of their information, is the same in the proposed and final rules. Last, the Court examines the “extent to which the effects of the rule differ from the effects of the proposed rule contained in the notice of proposed rule adoption.” The effects between the proposed and final rules are essentially the same. The penalty added mimics statutory law already in effect in Mississippi, which the original proposed rule would make applicable to members of the Water Association. Section 93-21-109 provides that records maintained by domestic violence shelters are exempt from public disclosure under the Mississippi Public Records Act. Miss. Code Ann. § 93-21-109(1) (Rev. 2013). It then provides that
Any employee, contractor, volunteer or agent of a domestic violence shelter, or of any other entity in possession of information which would tend to identify *300 a victim of domestic violence, who discloses. any information that is exempt from disclosure under the Mississippi Public Records Act of 1983, or makes any observation or comment about the identity or condition of any person admitted to a shelter or receiving services of a shelter, unless directed to do so by an order óf a court of competent jurisdiction, shall be civilly liable to the person whose personal.information was disclosed in the amount of Ten Thousand Dollars ($10,000.00), plus any compensatory damages that the individual may have suffered as the result of the disclosure.
Miss. Code Ann. § 93-21-109(2) (Rev. 2013) (emphasis added). The original proposed rule exposed the water associations to this liability under Section 93-21-109(2), as it placed information regarding domestic violence victims in the hands of utilities. “It is a familiar rule that ignorance of the iaw excuses no one, or that every person is charged with knowledge of the law.” Hoskins v. Howard, 214 Miss. 481, 59 So.2d 263, 269 (1952). Thus, the actual effect of adding this language to the rule itself imposes no new liability on the water associations; it merely puts them on better notice that they are exposed to the liability.
¶ 38. Moreover, as the MPSC points out, the Water Association had actual notice of this proposed change before the hearing, made arguments regarding it, and had its expert examine it; thus the Water Association was heard on the issue.
¶ 39. In sum, the final rule is a logical outgrowth of the proposed rule, and does not have any different effects, thus the rule does not violate the APA.

4. The rule does not violate the APA because the Economic Impact Statement was legally insufficient.

¶ 40. The Water Association argues that the rule is invalid because the economic impact statement (EIS) filed by the MPSC was legally insufficient. Section 25—48— 3.105 provides that an economic impact statement- must be prepared, and that it must include eleven specific items. Miss. Code Ann. § 25-43-3.105(2) (Rev. 2010). The MPSC filed an EIS that contained all the statutory requirements.
¶ 41. The statute also provides that
(3). No rule or regulation shall be declared invalid based on a challenge to the economic impact statement for the rule unless the issue is raised in the agency proceeding. No person shall have standing to challenge a rule, based upon the economic impact statement or lack thereof, unless that person provided the agency vuth information sufficient to make the agency aware of specific concerns regarding the statement in an oral proceeding or in- written comments regarding the rule. The grounds for invalidation of an agency action, based upon the economic impact statement, are limited to the agency ’s failure to adhere to the procedure for preparation of the economic impact statement as provided in this section, or the agency’s failure to consider information submitted to the agency regarding specific concerns about the statement, if that failure substantially impairs the fairness of the rule-making proceeding.
Miss. Code Ann. § 25-43-3.105(3) (Rev. 2010) (emphasis added). The Water Association argues that the standard for invalidating the rule is met because it alleges that the MPSC failed to produce a “meaningful” EIS. It also questions, that a new EIS was not created considering the civil liability (and criminal liability, it argues, due to a statute providing that any person violating ;a MPSC rule is guilty of a misdemeanor) for breaching confidentiality.
*301 ¶ 42. The MPSC argues that the Water Association improperly demands that the EIS take the costs of violating the rule and/or violating contractual obligations into account. Any economic consequence to the utilities assumes that the domestic violence victim will breach his or her utility contract and fail to pay a deposit after the sixty day waiver is up, as well as fail to pay his or her utility bill. Other economic consequences the Water Association argues were not taken into account deal with the civil liability, which requires the assumption that the utility would violate the rule. Because of a lack of Mississippi case-law on this issue, the MPSC cites the District Court of Appeal of Florida, in a case in which a party challenged the economic impact statement of a Department of Health rule as insufficient because it failed to address the economic consequences of a failure to comply with the rule. Health Care & Ret. Corp. of Am. v. Dep’t of Health & Rehab. Servs., 463 So.2d 1175, 1178 (Fla. Dist. Ct. App. 1984). The court stated that
Nothing in [the EIS] statute specifically requires a determination of the economic impact of the failure to follow the rule, and we specifically decline to construe the statute as imposing such a requirement in the preparation of economic impact statements. A rule will not be declared invalid merely because the. economic impact statement may not be as complete as possible; any deficiency in the statement must be so grave as to have impaired the fairness of the proceedings. ... The statement accompanying this rule addressed all of the statutory criteria. Appellant has failed to show any deficiency in the economic impact statement that impaired the fairness of the rulemaking proceedings in this instance.
Id. Likewise, nothing in the Mississippi statute specifically requires that an EIS evaluate the economic impact of violating the rule. Such a requirement would be overly cumbersome and likely would have endless possibilities.
¶43. The MPSC also argues that the EIS was sufficient. It notes that “[a] rule adopted after July 1, 2005, is invalid unless adopted in substantial compliance with the provisions of Sections 25-43-3.102 through 25-43-3.110.” Miss. Code Ann. § 25-43-3.111 (Rev. 2010). Thus, the EIS must substantially comply with the provisions of a statute. The EIS author, the Director of Economics and Planning Division of the Public Utilities Staff, a Ph.D., checked with the public utilities of other states that had implemented similar rules to inquire about the effects. The EIS addressed every statutory factor and the MPSC complied with procedure. The EIS thus substantially complies with the statute, as any alleged deficiency was not, so grave as to interfere with the fairness of the proceedings.
¶ 44. Because I believe that the domestic violence rule does not regulate “rates” under the plain language of the statute, and certainly when we apply a deferential standard of review to the MPSC’s interpretation of its own statutes, and because the Water Association’s other arguments likewise are without merit, I respectfully dissent.
DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION.

. Notably, the majority seems to simply disagree with the MPSC’s interpretation of its own statute, and does not appear to employ the deferential standard of review that we are required to apply to administrative agencies. It fails to explain how the MPSC’s interpretation is repugnant to the plain language or best reading of the statute, and simply substitutes its opinion of the best reading of the statute for the MPSC's.

. However, that same publication seems to define deposits as something other than some sort of charge collected for some service. It states that deposits “generally represent funds received from ratepayers as security against potential losses arising from failure to pay for services. ... [Deposits] represent a liability to repay the funds received either after a specified period or upon satisfaction of certain requirements,”

. Incidentally, a "rate base” is defined as “[t]he investment amount or property value on which a company, esp. a public utility, is allowed to earn a particular rate of return.” Rata base, Black’s -Law Dictionary (10th ed. 2014).

. Rule 9 regulates many aspects of deposits, including a provision that requires a return of deposits to customers over age sixty under certain provisions. Interestingly and confusingly, the Water Association and the majority do not explain why the MPSC has the authority to regulate aspects of the Water Association's members' deposits when it comes to customers of a certain age, yet magically does not have that same authority when it comes to domestic violence victims. Indeed, Rule 9 is the rule that allows utilities to collect a depos *297 it in the first place. Miss. Admin. Code § 39-1-2:9 ("Each utility may require from any customer or prospective customer a cash deposit to guarantee the payment of any such bills due .... ”), And it regulates the maximum deposit amount and the return of deposits. Under the majority’s holding, are members of the Water Association now allowed to charge deposits in any amount they want without limit? May its members now decline to return deposits upon cancellation of service, even when a customer has paid his or her balance in full? The majority’s holding is .far reaching.

. If the MPSC cannot regulate the timing of a deposit because it is an internal affair, the decision about which must be made by the Water Association members, then can it regulate the quality of water service the Water Association members provide? If the management decides to provide subpar service in order to save money, that would be a management decision, as well, under the Water Association’s urged interpretation.